*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0118P (6th Cir.)
File Name: 01a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

<u>99-1073</u>
THE CITY OF DETROIT,
        *Plaintiff-Appellee,*

    *v.*

GEORGE SIMON; JOSEPH
SIMON; NORINA SIMON;
SHIRLEY SIMON; MAURICE
TAYLOR; MADELINE TAYLOR;
U.S. GROUP, INC., a Michigan
corporation; U.S. EQUIPMENT
COMPANY, a Michigan
corporation,
        *Defendants-Appellants,*

EATON CORPORATION, an
Ohio corporation,
           *Defendant.*

<u>99-1128</u>
THE CITY OF DETROIT,
        *Plaintiff-Appellant,*

    *v.*

Nos. 99-1073/1128

1

GEORGE SIMON; JOSEPH
SIMON; NORINA SIMON;
SHIRLEY SIMON; EATON
CORPORATION, an Ohio
corporation,
          *Defendants-Appellees,*


MAURICE TAYLOR;
MADELINE TAYLOR; U.S.
GROUP, INC., a Michigan
corporation; U.S. EQUIPMENT
COMPANY, a Michigan
corporation,
          *Defendants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 91-75348—Avern Cohn, District Judge.

Argued:  November 28, 2000

Decided and Filed:  April 16, 2001

Before:  NELSON, SILER, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Robert Charles Davis, DAVIS LAW GROUP,
Mt. Clemens, Michigan, Eric J. Magnuson, RIDER,
BENNETT, EGAN & ARUNDEL, Minneapolis, Minnesota,
for Defendants.  Ruben Acosta, FINK, ZAUSMER &
KAUFMAN, Detroit, Michigan, for Plaintiff.  **ON BRIEF:**
Robert Charles Davis, DAVIS LAW GROUP, Mt. Clemens,
Michigan, Patrick F. Gordon, James H. Russell, WINSTON
& STRAWN, Chicago, Illlinois, Harry T. Quick,

MARTINDALE, BRZYTWA & QUICK, Cleveland, Ohio, for Defendants.    Ruben Acosta, FINK, ZAUSMER & KAUFMAN, Detroit, Michigan, for Plaintiff.

————————

**OPINION**

————————

DAVID A. NELSON, Circuit Judge.    This is an environmental protection case in which the plaintiff (the City of Detroit) thought it had reached a settlement with one of the corporate defendants (Eaton Corporation) during the second day of trial.    When the trial court was advised that Eaton and the city had resolved their differences, the terms of the settlement were placed on the record in open court.    Some weeks later, however, Eaton denied that there had been a meeting of the minds with respect to the scope of the "contribution protection" (*i.e.*, indemnification against demands for contribution among tortfeasors) that Eaton was to receive from the city.    The city's position was and is that the record contains a clear expression of agreement on the scope of such protection.

Professing itself unable to determine precisely what the parties had come to agreement on, the trial court denied a motion by the city for entry of a settlement judgment.    The case was eventually tried to completion, and a final judgment was entered on all claims.

Upon review, we conclude that the trial court erred in declining to hold Eaton to the settlement it had said it was accepting.    The record, as we read it, shows that the city's lawyer adequately clarified the scope of the agreed contribution protection.    The record further shows that Eaton's lawyer explicitly acknowledged that the clarification was correct.    Insofar as the district court subsequently found that the record did not manifest a meeting of minds, we are satisfied that the court's finding was clearly erroneous.

Both the city and the remaining defendants challenge other aspects of the final judgment as well. Unpersuaded, we shall reject these challenges.

## I

For a period of several decades ending in 1973, as we understand the uncontested facts, subsidiaries or corporate predecessors of Eaton Corporation owned and occupied a tract of industrial real estate located at the intersection of French Road and Grinnell Avenue in the City of Detroit. There were several buildings on the site, including a factory, a warehouse, a garage, a boiler house, and some office buildings.

Various firms occupied the property before and after Eaton's occupancy. Different occupants disposed of different hazardous wastes on the site. The contaminants included polychlorinated biphenyls ("PCBs"), petroleum, and petroleum by-products such as ethyl benzene, toluene, and xylene.

During a period that ended in 1989 the property was occupied by defendant U.S. Equipment Co., a wholly-owned subsidiary of defendant U.S. Group, Inc. The latter corporation is connected with defendants George, Joseph, Norina and Shirley Simon. It will be convenient for us to refer to the Simons, U.S. Equipment, and U.S. Group collectively as "the Simon group."

The City of Detroit acquired the real estate by condemnation in 1989. The purpose of the city's acquisition was to clear flight paths for a municipal airport located on the far side of a railroad track that runs next to the property.

The city demolished the factory and other buildings, cleaned up the PCBs, and, through consultants, made a detailed survey of the remaining contaminants. The city then brought the instant lawsuit against the Simon group, Eaton, General Motors Corporation (a sometime lessee of the property) and others. The relief sought included both

Simon group's argument under the circumstances of this case, where the argument was never presented to the district court and is offered for the first time after nearly a decade of litigation. See *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1002 (6th Cir. 1994).

The judgment entered by the district court is **AFFIRMED** in part and **VACATED** in part, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.

799, 803-804 (W.D.Mich. 1998), *rev'd on other grounds*, 228 F.3d 640 (6th Cir. 2000).

The property at issue in this case has a long history of industrial use. To require former occupants to assume liability for cleanup costs going beyond the level necessary to make the property safe for industrial use would be to provide an unwarranted windfall to the beneficiary of the cleanup.

C

Finally, we come to the Simon group's argument that the district court erred in holding the group liable for the PCB cleanup costs, the city having failed to comply with the National Contingency Plan before incurring those costs. The Simon group maintains that the city failed to allow 30 days for comment and failed to conduct a public meeting on the PCB cleanup program, as required under 40 C.F.R. § 300.700(c)(6).

Whatever the merits of this argument may be, the Simon group ignores the fact that the district court granted summary judgment on the city's PCB claim not only under CERCLA, the federal cost-recovery statute, but also under NREPA, the Michigan cost-recovery statute. The Michigan Court of Appeals has squarely held that substantial compliance with the NCP is not a prerequisite to cost-recovery under NREPA. See *City of Port Huron v. Amoco Oil Co.*, 583 N.W.2d 215, 223, 229 Mich.App. 616 (Mich.App. 1998), leave to appeal denied, 610 N.W.2d 548 (Mich. 2000). We defer to the Michigan court's interpretation of Michigan law. See, *e.g.*, *Cooper v. Scroogy*, 845 F.2d 1385, 1394 n. 3 (6th Cir. 1988).

In its reply brief, the Simon group argues for the first time that recovery for PCB contamination under NREPA is foreclosed because the state statute is preempted by the Toxic Substances Control Act, 15 U.S.C.A. § 2601 *et seq.* We generally decline to address arguments presented for the first time in a reply brief. See *Aetna Cas. & Sur. Co. v. Leahey Construction Co.*, 219 F.3d 519, 545 (6th Cir. 2000). It would be particularly inappropriate for us to address the

recovery of the environmental cleanup and investigation costs already incurred by the city and entry of a declaratory judgment with respect to future remediation costs. The city's claims were based in part on the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), and the former Michigan Environmental Response Act ("MERA"), M.C.L. §§ 299.601, *et seq.*, now recodified in Part 201 of the Michigan Natural Resources and Environmental Protection Act, M.C.L. §§ 324.20201, *et seq.* ("NREPA").

In 1994 the city moved for partial summary judgment on a claim that the Simon group was responsible for all of the PCB cleanup costs. The district court granted the motion, ultimately awarding the city $156,619.91 for reimbursement of its costs plus attorney fees. General Motors was dismissed with the acquiescence of the city.

On March 6, 1995, the case went to trial on the remaining claims against the Simon group and Eaton. Shortly before the trial was to resume the next day, the court was informed that Eaton and the city had reached a settlement. The terms of the settlement were promptly memorialized, at the court's request, in proceedings conducted on the record. With the reader's indulgence, we shall describe these proceedings in some detail.

After stating his understanding that there had been a resolution of the dispute between the city and Eaton, but no resolution of the dispute between the city and the Simon Group, the trial judge turned to the city for an account of what was being agreed to. Mr. David H. Fink, one of the lawyers representing the city, responded as follows:

"The terms of the settlement with Eaton will be a full and final settlement in the dispute between the City of Detroit and the Eaton Corporation would be the following:

One, the payment by [E]aton of $1.2 million cash; that is, no trust funds or anything. It would be one straight payment of $1.2 million.

Two, the City of Detroit would provide contribution protection with respect to any claims brought in the past or in the future with respect to this site *by the City of Detroit*. That, of course, would include the pending claims against the Simons but would also include any other claim that might be brought *by the City of Detroit* against any other parties. They would have contribution protection.

*There would not be any guarantee of indemnification as to third-party claims*. The City is not aware of any third-party claims that have been brought or threatened in any way with respect to the site with the exception of issues related to EPA and EPA has long since given up with respect to the Simon defendants." (Emphasis supplied.)

Mr. Fink went on to describe two obligations to be assumed by Eaton: an obligation to cooperate with the city on a statutory claim not directly relevant here, and an obligation to cooperate on the city's claims against other parties. More specifically, as far as the latter obligation was concerned, Mr. Fink explained that Eaton was agreeing not to object to the city's working with experts initially retained by Eaton, it being understood that Eaton would not have to incur further costs in this connection.

At this point, the transcript shows, Mr. James H. Russell, environmental litigation counsel for Eaton, asked for permission to confer with "co-counsel." (Mr. Russell may have been referring here to Eaton house counsel Sharon O'Flaherty, or lead trial counsel Harry T. Quick, or both.) After an off-the-record discussion between counsel, Mr. Russell went directly to the expert witness point; he offered no objection or other comment regarding Mr. Fink's explanation of the scope of the protection Eaton would receive against claims for contribution among tortfeasors.

would be necessary to reach the "industrial" cleanup level specified in M.C.L. § 324.20120a(1)(d). Our decision with regard to the settlement renders this issue moot as to Eaton, but the issue remains alive as far as the Simon group is concerned.

The city maintains that there is no statutory authority for capping liability for future cleanup costs. Moreover, according to the city, NREPA expressly forbids the imposition of such a cap by providing that the "cleanup category proposed shall be the option of the person proposing the remedial action, subject to department approval, considering the appropriateness of the categorical criteria to the facility." M.C.L. § 324.20120a(1).

We are not persuaded. With a few exceptions not relevant here, the types of response costs recoverable under CERCLA are limited to those that are "necessary" in light of the nature and type of property to be cleaned up. See 42 U.S.C. § 9607(a)(4)(B). Several federal courts have recognized that recovery of environmental cleanup costs incurred to achieve a higher level than the use of the property necessitates would violate CERCLA's requirement that recoverable response costs be 'necessary.' See, *e.g.*, *G.J. Leasing Co. v. Union Electric Co.*, 54 F.3d 379, 386 (7th Cir. 1995); *Southfund Partners III v. Sears, Roebuck and Co.*, 57 F.Supp.2d 1369, 1378 (N.D.Ga. 1999); *M.R. (Vega Alta), Inc. v. Caribe General Electric Products, Inc.*, 31 F.Supp.2d 226, 233 (D.Puerto Rico 1998).

Similarly, NREPA provides that the cleanup proposed should be "appropriate" in light of the facility's categorical criteria, see M.C.L. § 324.20120a(1), and it also provides that recoverable costs must be "necessary." See M.C.L. § 324.20126a(1)(b). As NREPA (formerly MERA) was patterned after CERCLA, it should be construed in accordance with the federal statute. See *Freeport-McMoran Resource Partners Ltd. Partnership v. B-B Paint Corp.*, 56 F.Supp.2d 823, 838 n. 7 (E.D. Mich. 1999), and *Kalamazoo River Study Group v. Rockwell International*, 3 F.Supp.2d

*Sfat*, 177 Mich. App. 506, 513, 442 N.W.2d 720 (1989) ("because defendant was present when the terms of the settlement agreement were read in open court and he voiced no objections thereto, we must conclude that it met with his approval").

If Eaton's lawyers were under the impression that, as a matter of law, Eaton could not be bound by anything said in the courtroom because of the fact that the details of the agreement would be fleshed out in writing later, their impression was mistaken. See *Pedder v. Kalish*, 26 Mich. App. 655, 182 N.W.2d 739 (1970). Eaton was obviously not at liberty to disavow the substance of that to which it was agreeing in open court. Just as Eaton was not free to decide that it would pay only $600,000 after having agreed to pay $1,200,000, so also was it bound by its agreement to accept limited contribution protection in lieu of the broad contribution protection it had asked for originally.

Our conclusion is in no way undermined by the parties' recognition that there might be future disagreement over how the principles agreed to on March 7 should be worded in the formal settlement agreement that was to follow. The district court's "baseball arbitration" proposal represented a sensible way of resolving any such disagreement. The court was obviously not proposing to arbitrate the question of whether, if one or the other of the parties should subsequently have a change of heart, that which had already been agreed to in principle could be repudiated. And what surfaced on April 28, 1995, when Eaton tendered its formal settlement document, was not a mere disagreement over the nuances of language intended to capture a principle on which there was still mutual agreement; what surfaced, rather, was an apparent attempt by Eaton to repudiate the agreement itself. The district court clearly erred in deciding to let Eaton get away with this.

### B

The city contends that the district court also erred when it limited the defendants' total liability for future costs to what

What Mr. Russell said was this:

"We do not expect a problem in the operation of the last point that Mr. [F]ink has just identified. I don't know that we're prepared to put that into the agreement.

The reason is that the experts that Mr. Fink would wish to have are independent contractors; they are outside experts."

The court then proposed a way of resolving the expert witness problem, if it was a problem, and Mr. Russell responded to the court's proposal by saying "[w]e have no objection."

Mr. Fink, on behalf of the city, then returned to the subject of contribution protection:

"Your Honor, the only item on the list that I see that will require any 'fl[e]shing out' in the agreement itself is the form of the contribution protection and I just want to be clear from the City's p[er]spective and that is that we would expect that any claims brought against Eaton *that arise from a claim brought by the City*, that the defense of that claim would be tendered to the City of Detroit and the City would have to affirm, as it would, as to the absolute guarantee to provide that contribution protection brought by the City of Detroit but then that the City would, of course, having taken on that responsibility, would control the defense of the claim." (Emphasis supplied.)

At this juncture the court offered a suggestion with regard to the final wording of the agreement with respect to such claims:

"Well, let me suggest this: If there is any dispute, that is to say, as to the wording of *this portion* of the agreement you will each submit your respective draft to the Court and the Court will choose between the two." (Emphasis supplied.)

Adding that he envisioned the possibility that "there may be a dispute over the phraseology" of this portion of the agreement, the judge described his proposal for resolving any such dispute as "baseball arbitration." Mr. Russell, speaking on behalf of Eaton, said that the court's suggestion was "fine with us." Mr. Fink indicated that the suggestion was acceptable to the city as well, "as long as the Court did not find what I stated on the record is objectionable."

The judge assured Mr. Fink that "I don't find it objectionable." Mr. Fink explained that he wanted "to avoid any misunderstanding on the record." In response, the court asked Mr. Russell if he agreed in principle with what Mr. Fink had said. Mr. Russell answered in the affirmative: "In principle, yes." Mr. Russell then repeated that Eaton had no problem with the court's "baseball arbitration" suggestion.

The transcript continues as follows:

"MR. FINK: Your Honor, experience suggests to me is the best thing at this point would be to be candid with the Court about where the disagreement fell at one point [in the settlement negotiations] to be sure that the –

THE COURT: All right, go ahead.

MR. FINK: At one point in discussions among Counsel there was a suggestion that – by opposing counsel – that contribution protection might involve the City reimbursing Eaton for the cost of defending claims under the circumstances – "

The trial court, unfortunately, did not allow Mr. Fink to finish his sentence. Cutting Mr. Fink off as he was starting to describe what Eaton had suggested about contribution protection, the court said "No, that's not part of this. That's not contribution protection."

The court's interjection evoked the following response:

against other parties." Such contribution protection, Mr. Fink made clear, would not extend to third-party claims not stemming from demands by the city: "There would not be any guarantee of indemnity as to third-party claims."

If Eaton was unwilling to accept this limitation, it had an obligation to say so. Yet it voiced no objection at all. On the contrary, when Mr. Fink repeated that the city was talking about "any claims brought against Eaton that arise from a claim brought by the city," Mr. Russell explicitly stated that the company agreed, in principle, with what Mr. Fink had said. And when, to avoid even the slightest possibility of misunderstanding, Mr. Fink again made it clear that the contribution protection to be provided by the city was "not indemnification through any third-party" but was limited to protection against "[a]ny claim brought against Eaton arising from a claim brought by the City of Detroit," Eaton agreed again: "That's correct," Mr. Russell said on the record.

There was nothing the least bit arcane about this. The city's interpretation of the agreement reached on March 7, 1995, is the interpretation to which any objective reading of the transcript necessarily leads.

If Mr. Russell's own subjective understanding of what was being said happened to be deficient for some reason, this could hardly change the result. Whether the minds of the parties are to be deemed to have met on an oral settlement agreement is "judged by an *objective* standard, looking to the express words of the parties and their visible acts." *Groulx v. Carlson*, 176 Mich. App. 484, 491, 440 N.W.2d 644 (1989). (Emphasis supplied.)

The express words and visible acts of the parties in the instant case leave us with the firm conviction that there was a mutual manifestation of intent to accept a settlement on the terms stated by Mr. Fink. And we are strengthened in this conviction by the fact that house-counsel for Eaton was present at the March 7 session and never expressed the slightest reservation about the agreement that was being placed on the record. See *Michigan Bell Telephone Co. v.*

Eaton itself – the district court had long since entered an opinion and order holding that "municipalities are *not* within the scope of the term State . . . ." (Emphasis supplied.) (R.E. 43, Memorandum and Order of July 10, 1992.) There is thus no way that the *city's* settlement of its environmental claims against Eaton could have entitled Eaton to the statutory contribution protection prescribed by CERCLA where a *state* settles its CERCLA claims.

The limited availability of statutory contribution protection does not mean, of course, that Eaton could not have asked the city to provide extra-statutory indemnification against any and all claims for contribution, whether stemming from claims asserted by the city or not. Eaton obviously did ask for such indemnification. The agreement Eaton may have wanted, however, was not the agreement Eaton ultimately accepted.

Whether or not there had been a meeting of minds on the scope of contribution protection prior to the proceedings conducted on the record on the morning of March 7, 1995 – and for purposes of this opinion we shall assume that the minds of the parties had not previously met on this issue – the March 7 transcript clearly manifests a meeting of minds at that point. The summary of the deal placed on the record by Mr. Fink in open court on March 7, 1995, makes it abundantly clear that the city's commitment to hold Eaton harmless against contribution claims advanced by other alleged tortfeasors would be limited to situations where the other tortfeasors were asking Eaton for exoneration in respect of claims asserted by the city itself. Whether Eaton might still have wanted indemnification broader than that is immaterial – for Mr. Fink repeatedly explained, in the clearest of terms, that broader indemnification was simply not on offer.

The city's commitment, as Mr. Fink explained without ambiguity, would be to provide contribution protection "with respect to any claims brought . . . by the city of Detroit" – both the pending claims against the Simon group and "any other claim that might be brought by the city of Detroit

"MR. FINK: The City, obviously, would be only able to control the defense if it accepted liability and *it must accept liability in any kind of contribution action that may arise from City action.* Then we do have an agreement." (Emphasis supplied.)

Turning to Mr. Russell, the court asked if he had any problem with what Mr. Fink had said. The following exchange ensued:

"MR. RUSSELL: I'm sorry, I missed the first part of it and I wonder if he would be good enough to repeat it?

MR. FINK: Contribution protection is any claim brought against us by anyone, the Simons or anyone else in connection with this, would be tendered by us to the plaintiff under the contribution protection. Plaintiff then wants the right to control that litigation.

That's the nature of contribution protection, they want to be immunized from any affect of any contribution other party."

Eaton's brief on appeal characterizes this particular statement as "uninterpretable." The characterization strikes us as apt. The trial judge, however, thought he understood what Mr. Fink was trying to say:

"THE COURT: What Mr. Fink is saying is that if you incur any expense as a consequence of being named, other than expenses relating to any alleged breach of the City's obligation, they're your own.

MR. RUSSELL: We agree with that.

THE COURT: Isn't that what you said?

MR. FINK: If I didn't, I should have.

MR. RUSSELL: That's fine."

Evidently wanting to get back to the point he had been about to make when interrupted by the court, Mr. Fink then spoke as follows:

"MR. FINK:  There was one thing that was said by Mr. Russell; I don't think it was intentionally excluded but I want to be clear.  He referenced 'any claim brought against Eaton.'  Any claim brought against Eaton *arising from a claim brought by the City of Detroit*.  It's *not* indemnification through any third-party to be filed." (Emphasis supplied.)

These words, it seems to us, are far from uninterpretable. They are entirely consistent with what had already been said several times, and, taken in context, we believe their meaning is clear.  Mr. Fink was obviously saying that the city would protect Eaton against any claim for contribution that arose from a claim the city was asserting against the party seeking contribution.  Mr. Fink was also saying that the city would not indemnify Eaton against third-party claims that did not arise from claims asserted by the city.

Mr. Fink's clarity on this point is fully matched by the clarity of the response given by counsel for Eaton:

"MR. RUSSELL:  *That's correct*."  (Emphasis supplied.)

"That's correct," we take it, means what it says.  We do not interpret Mr. Russell's response as meaning "that's not correct."  Yet on April 28, 1995, a little over seven weeks after telling the court and counsel that Mr. Fink was correct in his description of what the parties were agreeing to, Mr. Russell sent Mr. Fink a letter asserting that "[t]he form of protection Eaton would receive was never clarified by the City . . . ."  Tendered with the April 28 letter was a proposed settlement agreement containing an indemnity provision so broad as to be irreconcilable, in our judgment, with the agreement in principle memorialized in the March 7 transcript.

provisions of the federal National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 30 C.F.R. Part 300, precluded recovery of the PCB costs.  We shall address these issues in the sequence indicated.

## II

### A

As we have seen, Eaton represents that during the negotiations that preceded the March 7 memorialization of the settlement, Mr. Russell used the phrase "contribution protection" as referring to the complete discharge of contribution liability prescribed by 42 U.S.C. § 9613(f)(2). Maybe so, but the phrasing of the representation strikes us as peculiar.

We have no reason to doubt that Eaton sought the broadest possible protection against claims for contribution.  Eaton's affidavits so indicate, and during the March 7 courtroom colloquy Mr. Fink mentioned this as an issue over which there had been disagreement.  As will be obvious from examination of the text of § 9613(f)(2), however (see note 1, *supra*), Eaton's assertion that both parties were understood to be referring to "statutory contribution protection under § 113 of CERCLA [42 U.S.C. § 9613]" would mean, if true, that both parties were misreading CERCLA.  We find it curious that sophisticated lawyers such as these should not have known what § 113 of CERCLA actually says.

What it says is that an administrative settlement (or a judicially approved settlement) of "liability to the United States or a State" will protect the settling party against liability on claims for contribution.  Strictly speaking, then, "statutory contribution protection" can exist only when the settlement is with the federal government or a state government.

The city of Detroit is certainly not "the United States."  And Eaton had no reason to suppose that the city could be equated with "a State."  We know this is so because – on motion of

* * *

"For the reasons stated above, and for reasons of judicial economy and prudence, as well as the inability of the Court to determine precisely what the parties came to agreement on on March 7th, 1995 . . . this case [must] go to trial."

The case did go to trial, a request for certification of an interlocutory appeal having been denied, and a final judgment was entered on December 10, 1998. That judgment, among other things,

– fixed Eaton's total liability, as of October 31, 1998, at $301,415;

– fixed the Simon group's liability as of that date at $80,683, exclusive of liability for the costs associated with the cleanup of PCBs;

– finalized the $156,619.21 judgment against the Simon group for PCB costs, and set the interest that had accrued thereon through October 31, 1998, at $77,599; and

– declared Eaton and the Simon group liable for specified percentages of future recoverable "Response Costs" and "Response Activity Costs," subject to the proviso that there should be no liability for costs "[i]ncurred to achieve a clean up level in excess of the industrial clean up category in Mich. Comp. Laws § 324.20120a(1)(d)."

The city raises two issues on appeal: (1) whether the district court erred in refusing to enforce the settlement agreement memorialized in the proceedings held on March 7, 1995, and (2) whether the district court erred in limiting the defendants' liability for future cleanup costs to those costs incurred in achieving an "industrial clean up" as defined in NREPA. The Simon group raises a single issue on appeal: whether a failure by the city to comply with certain notice

The settlement agreement proposed by Eaton on April 28 would have obligated the city to indemnify Eaton against "all claims" involving the city and/or Eaton asserted by "any or all" persons or entities, governmental or nongovernmental, in connection with contamination at the French Road-Grinnell Avenue site. There was no exclusion of third-party claims not arising from claims asserted by the city. Contrary to the understanding reflected in the March 7 transcript, the new proposal called for indemnification of Eaton by the city against any such claims, as well as against contribution claims arising from claims by the city.

The city did not sign the proffered agreement, so Eaton moved to have the case reset for trial. A brief opposing this motion was filed by the city, together with a motion for entry of a settlement judgment. The city's proposed form of judgment would have required the city to "defend and hold Eaton harmless from and against any and all claims or demands for contribution or lawsuits or other actions for contribution *brought against Eaton as a direct result of any claim, demand, lawsuit or other action brought by the City* in connection with environmental contamination of the real property and improvements located at the intersection of French Road and Grinnell Avenue . . . ." (Emphasis supplied.)

Eaton opposed the city's motion in a brief accompanied by affidavits from Messrs. Russell and Quick. The Russell affidavit contained the following averments, among others:

– that in the environmental legal community, as Mr. Russell believed, "contribution protection" was widely understood to be a term of art signifying that upon the settlement of a CERCLA claim, *all* contribution liability of an alleged joint tortfeasor is extinguished;

– that this usage stemmed from § 113 of CERCLA (42 U.S.C. § 9613) (we quote the relevant statutory language in the margin);[1]

– that in settlement discussions conducted with the city's counsel prior to March 7, 1995, Mr. Russell had made it clear that Eaton would require broad and final protection from future claims;

– that Mr. Russell had used the term "contribution protection" in formulating Eaton's settlement offers, and in so doing he had been referring – as he believed Mr. Fink had been referring – "to statutory contribution protection under § 113 of CERCLA . . .;"

– that settlement discussions conducted under the district court's auspices on the morning of March 7, 1995, had failed, and the parties had been ordered back into the courtroom to recommence trial; then, seconds before the judge re-entered the courtroom, Mr. Fink approached Eaton's trial table and said "We'll take the $1.2;"

– that there was no discussion of any other component of the settlement until the court asked Mr. Fink to summarize the agreement; and

– that "[s]ince it was clear to both counsel for Detroit and the Court that the settlement between Eaton and Detroit needed to be reduced to writing, [Mr. Russell] did not regard the comments of counsel

---

[1] "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement." 42 U.S.C. § 9613(f)(2).

before the Court in open court to set forth the details of the parties' proposed settlement."

Attorney Quick's affidavit, which was much shorter, averred in essence that

– once settlement discussions had commenced, Mr. Quick made it clear to the city's counsel that Eaton intended to condition settlement upon the city's providing Eaton "complete protection . . . from any future claims by the Michigan Department of Natural Resources, adjoining landowners and/or subsequent purchasers of the subject property;" and

– Mr. Fink told Mr. Quick that the city was prohibited by law from lending its credit so as to provide Eaton with indemnity, but that Mr. Fink, knowing what Eaton desired, indicated that equivalent protection could be provided with respect to such claims.

On August 8, 1995, after hearing oral argument on the pending motions, the district court announced from the bench that it was granting Eaton's motion to set the case for trial and was denying the city's motion for entry of a settlement judgment. In explaining its thinking, the court made these observations, among others:

"The statutes involved are complex. The distinction the parties draw on what was said on March 7th, 1995 involve arcane concepts of law and are based on a specialized glossary. The City may well be right that the protection for Eaton it agreed to was limited and that Eaton's concerns are at best speculative and conjectural.

"On the other hand, Eaton agreed to pay $1,[2]00,000.00 with, it says, the expectation it would have peace of mind and get on with its corporate life. For the Court to sanction the City's view of the agreement reached on March 7th, 1995 would be inappropriate.