NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0361n.06

No. 13-1853

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BELLWETHER COMMUNITY CREDIT UNION, A State of New Hampshire Chartered Credit Union, | ) ) ) ) | **FILED**<br>May 12, 2014<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| CUSO DEVELOPMENT COMPANY, LLC, A Michigan Limited Liability Company, | ) ) ) | |
| Defendant-Appellee. | ) ) | OPINION |

Before: COLE, GILMAN, and DONALD, Circuit Judges.

**BERNICE B. DONALD, Circuit Judge.** Bellwether Community Credit Union ("Bellwether") appeals a district court order granting summary judgment in favor of CUSO Development Corporation ("CDC") in this dispute over the parties' respective rights and obligations under the Michigan Limited Liability Company ("LLC") Act, M.C.L. § 450.4101 *et. seq.*, following their corporate dissociation. For the reasons below, we AFFIRM the judgment of the district court.

1

# I. BACKGROUND

CDC is a credit-union-services business registered as a limited liability company in Michigan. The company provides administrative services to small-scale financial institutions, such as community credit unions.[1] Bellwether is a community credit union and a registered financial institution in New Hampshire.

Bellwether joined CDC by making an initial capital contribution of $300,000 for 50 Class A units (i.e. shares in the company) in February 2008. In addition to receiving an ownership interest in CDC, Bellwether received a seat on CDC's Board of Directors, which was filled by Bellwether's President and CEO, Michael L'Ecuyer, until Bellwether withdrew from CDC in 2011. Shortly thereafter, Bellwether filed this lawsuit under Michigan's LLC Act, claiming that it was entitled to a withdrawal distribution from CDC based on the "fair value" of its interest in the company on the date of withdrawal. *See* M.C.L. § 450.4305.

The parties agree that CDC's Operating Agreement governs the parties' respective rights and obligations, and that the Operating Agreement is controlled by Michigan law. They disagree, however, in their interpretation of the Operating

---

[1] By joining an organization like CDC, community credit unions, like Bellwether, are able to avoid numerous expenses that they otherwise would have to incur by performing certain tasks or providing certain services themselves. Membership in an organization like CDC typically also allows credit unions to pool resources and share overhead costs so that they can offer a wide array of financial services to its customers, often at a lower rate than other financial institutions.

Agreement and its implications for the application of Michigan's default provisions, which apply only when the terms of an operating agreement are silent or ambiguous as to any particular issue, or if an operating agreement is otherwise invalid.

Michigan's LLC Act generally provides that "[d]istributions of cash or other assets" are to be "allocated among the members" of an LLC "in the manner provided in an operating agreement." M.C.L. § 450.4303. The statute also provides default mechanisms, however, for determining how to allocate distributions in the event that a company's operating agreement is silent or does not adequately address a particular situation.

Under Michigan law, whether a member may withdraw from an LLC is also generally governed by the company's operating agreement. M.C.L. § 450.4509 ("A member may withdraw from a limited liability company only as provided in an operating agreement."). In the event that a member seeks to withdraw from a company, "[the] operating agreement may provide for an additional distribution to a withdrawing member." If the operating agreement "is silent" as to the distribution amount owed to a withdrawing member, however, then Section 450.4305 provides that a withdrawing member "is entitled to receive" a distribution amount that represents "the fair value of the member's interest" in the company "based upon the member's share" in the company on the date of its

withdrawal. M.C.L. § 450.4305. This provision clearly does not apply, however, unless the applicable operating agreement is "silent" concerning the amount owed in "additional withdrawal distribution" to a dissociating member. *Id.*

Based on the foregoing, Bellwether claims that CDC was obligated to buy back its shares in the company upon withdrawal, as required by Section 450.4305, because the Operating Agreement was silent concerning what, if any, additional withdrawal distribution Bellwether should have received upon dissociating from CDC. In its motion for summary judgment, CDC countered that the default provision relied upon by Bellwether was inapplicable in the instant case, because the Operating Agreement was neither silent nor ambiguous concerning the distribution rights of withdrawing members. After careful review of the Operating Agreement, the district court sided with CDC, concluding that the Operating Agreement was not silent on additional withdrawal distributions, and finding that specific language in the Operating Agreement precluded the application of Michigan's default provision, M.C.L. Section 450.4305, for withdrawal distributions.

On appeal, Bellwether argues that the Operating Agreement was "silent" on additional withdrawal distributions, and that it should therefore be entitled to the "fair value" of its interest in CDC under M.C.L. § 450.4305, which applies when "an operating agreement permits withdrawal but is silent on an additional

4

withdrawal distribution." CDC counters that § 450.4305 does not apply here because the Operating Agreement was *not* silent on the issue of withdrawal distributions, but rather expressly provided that it had no obligation to distribute any amounts beyond Bellwether's initial capital contribution when it withdrew. Therefore, this case necessarily turns on the language of the Operating Agreement itself.

## II. THE OPERATING AGREEMENT

The relevant portions of the Operating Agreement provided that members could voluntarily dissociate from CDC at any time by giving written notice at least 120 days in advance:

> 12.1 *Disassociation* - An Organization shall cease to be a Member upon . . . the voluntary withdrawal of the Member upon one hundred and twenty (120) days written notice to the Company and all Members (the effective date of the disassociation is at the end of the quarter when the Company and other Members receive written notice of the voluntary written withdrawal);
>
> 12.2 *Rights of Disassociating Member* - In the event any Member disassociates . . . the Transfer of the Member's Units in the Company must comply with . . . the Right of First Offer in Section 11.4.

The Operating Agreement also provided CDC with a right of first refusal, or "Purchase Option," to buy the shares back from a dissociating member in the event of a withdrawal; if the Company declined to exercise its Purchase Option, the right of refusal would then pass to other CDC members:

5

11.4 *Right of First Offer* - If a Member, (a "Transferor") desires to transfer or assign all or any portion of, or any interest or [rights] in [sic] in . . .the Company (the "Transferor Interest") . . . [it] shall notify the Company of that desire . . . [in a] "Transfer Notice" . . . describ[ing] the Transferor Interest . . . [At which point,] [t]he Company (or if the Company declines . . . [its] Members) . . . shall have the option (the "Purchase Option") to purchase . . . the Transferor Interest, for a price . . . set forth in the Transfer Notice (the "Purchase Price") [at any time during the following 90-day period]. . .

Finally, if neither the Company nor its Members exercised the option to purchase the shares at the disassociating member's asking price, Section 11.4(c) of the Operating Agreement allowed dissociating members to sell their interest in the Company to a third party:

If the Company [and its Members] fails to exercise the Purchase Option, the Transferor shall be permitted to offer and sell for a period of ninety (90) days (the "Free Transfer Period") after the expiration of the Transfer Period at a price not less than the Purchase Price. If the Transferor does not transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to transfer the Transferor Interest shall cease and terminate.

Operating Agreement, Section 11.4(c).

From the time that Bellwether joined CDC in 2008 until its withdrawal in 2011, CDC's Operating Agreement remained unchanged. CDC's Board of Directors did, however, consider a series of proposed amendments to the Operating Agreement, none of which passed, just a few days prior to Bellwether's decision to dissociate from CDC. Among these potential modifications was a proposed amendment to Section 12.2.b, which would have required CDC to pay

6

withdrawing members, over a period of five years, the actual value of a member's interest in the company at the time of withdrawal (as opposed to refunding only that member's initial capital contribution) . On January 5, 2001, a vote was held and the proposed amendment fell shy of the necessary supermajority to pass; thus, the original Operating Agreement remained in effect. Because a majority of the CDC members had voted in favor of the proposed amendment, however, many members were initially confused regarding the status of the Operating Agreement; some members were apparently under the mistaken impression that the Operating Amendment *had*, in fact, been amended.

On January 25, 2011, just a few days after voting against the proposed amendment, Bellwether notified CDC of its intent to withdraw from the company, effective March 11, 2011.[2] The notice prompted a series of exchanges between CDC and Bellwether regarding the terms of Bellwether's withdrawal.

On February 9, 2011, CDC's CEO Tom Davis, under the mistaken belief that the Operating Agreement had been amended, wrote to L'Ecuyer that the value of Bellwether's capital account would be calculated as of March 31, 2011, "the effective date of Bellwether's disassociation" and that "in accordance . . . [with] Section 12.2.b," this amount "would be paid over a period [of five years]." Davis

---

[2] Although the letter is dated January 5, 2011, other portions of the record suggest that CDC received the letter on January 25, 2011.

later explained, however, that he had been confused about the passage of the proposed amendment at the time of this correspondence, and that the valuation and distribution amounts he cited in that letter were based on his mistaken understanding that the amendment had indeed passed.

L'Ecuyer, on the other hand, clearly understood that the amendment had not passed, as is evidenced by his response to Davis by correspondence dated February 28, 2011. In the letter, he corrected Davis's assertion that the proposed amendment had passed, and specifically noted that the original Operating Agreement remained in effect and that "the terms of the original . . . Operating Agreement apply to [Bellwether's dissociation from CDC]." In response, Davis agreed to the fact that the Operating Agreement had not actually been amended.

Pursuant to the withdrawal provisions of the original Operating Agreement, in late July 2011, Bellwether offered its 50 Class A shares for sale to CDC and then to its members at an asking price of $13,104.66 per share. Neither CDC nor its members elected to purchase Bellwether's shares at that price, and Bellwether did not attempt to find a third party buyer. Instead, Bellwether filed this lawsuit, under the Michigan Limited Liability Company Act, M.C.L. § 450.4305, claiming that it was entitled to a withdrawal payment of $655,233 from CDC, representing the "fair value" of its 50 Class A shares at the price of $13,104.66 per share.

8

## III. ANALYSIS

### A. Standard of Review

A district court's grant of summary judgment is a question of law subject to de novo review by this Court. *Minadeo v. ICI Paints,* 398 F.3d 751, 756 (6th Cir. 2005). "Questions of contract interpretation, including those that form the basis for the grant of summary judgment, are subject to de novo review" as well. *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008) (citing *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005) (applying Michigan law)).

### B. The Operating Agreement was not "Silent" as to the Rights of Withdrawing Members

As noted by the district court, Bellwether's argument that the Operating Agreement failed to address or was silent as to a withdrawing member's rights misconstrues the language therein.

The Operating Agreement established a detailed process for a withdrawing member to follow, which clearly contemplated a discretionary withdrawal distribution if CDC exercised its right of first refusal to purchase shares back from a dissociating member. Specifically, Section 12.2.b provided that "the Transfer of the Member's Units in the Company must comply with the provisions of this Agreement set forth in Article XI, including the Right of First Offer in Section

9

11.4." Then, Section 11.4 provided a specific mechanism for a withdrawing member to recover the value of its shares by one of three methods: (1) with a buy-back of the shares by CDC itself (i.e., a withdrawal distribution); (2) by offering the shares to other members of CDC; or (3) by selling its shares in CDC to a member of the public, including the purchase of the withdrawing member's units by CDC.

Under the first method, if CDC had exercised its option to buy back the shares, then the cash payment from CDC to Bellwether to purchase the shares under Section 11.4 would have qualified as a withdrawal distribution. *See* M.C.L. § 450.4102(2)(g) (defining "distribution" as "a direct or indirect transfer of money" by the company "to or for the benefit of its members" with respect to "the members' membership interests"); *see also Florence Cement Co. v. Vettraino*, 807 N.W.2d 917, 924 (Mich. 2011). Accordingly, while the Operating Agreement did not establish an absolute right to a distribution upon withdrawal, it was certainly not "silent" on the issue; rather, Section 11.4 provided a mechanism for a withdrawing member to receive a withdrawal distribution if the CDC elected to exercise its right of first refusal and purchase Bellwether's shares. CDC did not, however, exercise its Purchase Option, and neither did any of its other members. The fact that CDC, following the plain language of the Operating Agreement,

10

declined to exercise its Purchase Option does not make the language of the Operating Agreement silent on this issue.

It is not clear why Bellwether did not then attempt to sell its shares in CDC to a third party, as it was allowed to do under Section 11.4(c) of the Operating Agreement. Either way, however, the fact that the Operating Agreement contemplated a Purchase Option, which, in turn, specified that any withdrawal distribution from CDC to a dissociating member would be based upon that member's stated Purchase Price, clearly precludes Bellwether's claim that the Operating Agreement was "silent" within the meaning of M.C.L. § 450.4305.

## C. Parol Evidence and Principles of Equity

Given the plain language and meaning of the Operating Agreement, there is no need to delve into Bellwether's remaining arguments, all of which rely upon extrinsic parol evidence. *See Fulfer v. Kaesermann*, No. 297336, 2011 Mich. App. LEXIS 1112, at *4 (Mich. Ct. App. June 21, 2011) ("If the writing is clear, this Court must give full effect to the writing and parol evidence will be inadmissible." (citing *Bufe v. Rudell*, 780 N.W.2d 884, 894-95 (Mich. Ct. App. 2009)). Bellwether makes a number of arguments—some for the first time on appeal—to support its position that we should give weight to CDC's actions and course of dealing with its other members. None of these arguments can be taken into

account, however, as they are all premised on Bellwether's view that the original Operating Agreement was vague and ambiguous such that extrinsic evidence should replace the Operating Agreement in determining entitlement to a withdrawal distribution. Although it is true that courts can look to extrinsic evidence, such as the parties' conduct, to interpret an ambiguous contract; it is equally true that extrinsic evidence is not admissible to interpret an unambiguous contract, which must be enforced as written. *See Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005); *see also Fulfer*, 2011 Mich. App. LEXIS 1112, at *4 ("However, if the writing is ambiguous, extrinsic evidence may be used to determine the intent of the parties." (citing *Blackhawk Dev. Corp. v. Vill. of Dexter*, 700 N.W.2d 364, 373 (Mich. 2005)).

Here, however, Bellwether did not argue that the Operating Agreement was ambiguous in the district court below, and it cannot do so now. *See City of Detroit v. Simon*, 247 F.3d 619, 630–31 (6th Cir. 2001). When the district court grants summary judgment on a claim, it is not appropriate to address a new argument which is being raised for the first time on appeal. *See id.* Moreover, the Operating Agreement contained no ambiguities as to withdrawal distributions in the event that CDC declined to exercise its Purchase Option. The Purchase Option was just that—an option. Bellwether cannot now claim that CDC was contractually obligated to purchase its shares where the Operating Agreement's plain language

12

clearly contemplates only an option. Bellwether fails to explain how any particular provision of the Operating Agreement is ambiguous, except for its vague allusion to confusion among the CDC members regarding the proposed amendment to Section 12.2.b.

Furthermore, the record shows that Bellwether was never itself confused about whether the amendment had passed. As noted by the district court, "the record evidence is clear that [Bellwether] . . . had notice that [CDC] . . . did not intend to pay Bellwether . . . the [claimed] value of its capital account . . . and Bellwether elected to withdraw anyway." The correspondence between L'Ecuyer and Davis demonstrates that Bellwether understood its rights under the Operating Agreement, knew that CDC was not obligated to buy back its shares, and yet still went through with the withdrawal. In short, Bellwether is precluded from arguing that the Operating Agreement was ambiguous where the record clearly demonstrates Bellwether's unambiguous understanding of the Operating Agreement when it withdrew from CDC. Accordingly, Bellwether's reliance on extrinsic evidence including a memo circulated by CDC's attorney in 2008, its emphasis on Davis's deposition testimony, and its interpretation of CDC's "prior course of dealing" are irrelevant where, as here, the plain language of the Operating Agreement left no ambiguity as to its meaning.

Bellwether's appeal to "principles of equity" is equally misplaced. Recognizing that the language of the Operating Agreement regarding withdrawal distributions is fatal to its claim, Bellwether argues that equitable principles should be applied to modify the parties' contractual rights and obligations. The Michigan Supreme Court has explained that principles of equity alone do not serve as a basis for ignoring express contractual provisions under the guise of interpretation. *See Rory*, 703 N.W.2d at 30. Put simply, Bellwether cannot avoid the unambiguous language of the Operating Agreement by resorting to its skewed interpretation of equitable principles. *See id.*

In any event, principles of equity do not support Bellwether's position in this case. Awarding Bellwether the amount which it claims represents the "fair market value" of its capital account would result in a windfall for Bellwether. L'Ecuyer's testimony reinforces this fact, as even he acknowledged that "no credit union in their right mind" would buy Bellwether's shares in CDC for its asking price of approximately $655,000. The fact that Bellwether made no effort to sell its shares to a third party at that rate further supports CDC's argument that Bellwether knew that its asking price was inflated. If Bellwether's asking price had been a "fair" reflection of the market value for its interest in CDC, then presumably, Bellwether should have been able to sell its shares at that rate to a third party in the open

14

marketplace, as it was entitled to do under Section 11.4(c) of the Operating Agreement.

## IV. CONCLUSION

There was nothing unfair or inequitable about holding Bellwether to the Operating Agreement. Accordingly, we AFFIRM the district court's order granting summary judgment for CDC.