**BEHR SYSTEMS, INC., a Michigan Corporation, Plaintiff–Appellant,**

v.

**ENVIROMETRIC PROCESS CONTROLS, INC., Defendant–Appellee.**

No. 00–6253.

United States Court of Appeals, Sixth Circuit.

Feb. 28, 2003.

Before KEITH and DAUGHTREY, Circuit Judges, and MARBLEY,* District Judge.

DAUGHTREY, Circuit Judge.

This appeal is from the district court's decision in a diversity contract case that the agreements entered into by the parties were too ambiguous to be enforceable. The court reasoned that the parties had different interpretations of two core terms of the contract, each of which was "reasonable from their own perspective," and that it was unreasonable to believe that either side would have agreed to the other side's interpretation. The plaintiff, Behr Systems, Inc., challenges this ruling on appeal, arguing that the terms in question, while admittedly less clear than they could be, have a mutually-agreed-upon meaning that can be discerned by extrinsic evidence, including the parties' behavior before and after the contract was made. Because we agree with this contention, we find it necessary to reverse the judgment of the district court in this case.

## PROCEDURAL AND FACTUAL BACKGROUND

### The Parties

The plaintiff, Behr Systems, Inc. (Behr), is a Michigan company that designs and installs "turnkey"[1] automated paint application systems for automobile manufacturers.[2] Behr also upgrades hardware,[3] software, and related computer systems for its customers. The defendant, Envirometric Process Controls, Inc. (EPC), is a Ken-

---

* The Hon. Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1. A "turnkey" paint application system means that the contractor designs the entire system, manufactures and installs the equipment, and then hands it over to the client as a fully functional system, which the client can operate by merely "turning a key."

2. Cars were hand-painted until the 1980s, when manufacturers began to replace manual spray zones with automated systems. In the automated systems at issue in this case, cars are placed on a conveyor through a series of paint booths containing primecoat, basecoat, and clearcoat zones. Those booths are comprised of a variety of equipment: "bells," which spray the paint onto the cars, overhead cabinets, on which the bells are mounted; control color changers, which control the color of the paint; speed transducers, which control the speed of the rotation of the bell cup on the end of the bells' applicators; fluid transducers and regulators, which control the amount and flow of the paint sent to the bells' applicators; shaping air transducers, which control the width of paint pattern sprayed on to the car; optic-to-electric box and fiber optic cables; and solenoid valves, which control the color changer color changers. All of this equipment is controlled by computer control systems located outside of the booths. The computer panel, called the PLC, is the "traffic cop" of the paint application system. The PLC is operated by software, which allows it to communicate with the equipment. A person controls the computer system and the equipment by using a console, which contains a key pad and computer screen. There is one console for each paint application booth.

3. Werner Baumgartner, the President of Behr, testified that "hardware" includes "the machines, what we call the applicator, color changers, physical things you can touch, as well as the computer, the transducers to control certain air flows and speed of our bell, electrical panels."

tucky company that designs and installs the computer software that controls automated paint spraying systems.[4] Unlike Behr, EPC does not manufacture any painting equipment.[5]

In 1981, Behr installed the original automated paint application system at the Nissan Plant in Symrna, Tennessee, and in the mid–1980's. Behr installed the original automated paint application system at the Ford Motor Company's Louisville Automotive Plant (Ford LAP). At both plants, Behr installed its system in the prime zone, two basecoat zones, and two clearcoat zones. Behr developed and patented the "Estabell applicator," which reduces the paint into fine particles before it is sprayed onto the car. At Ford LAP, Behr was responsible for the installation of the software to run the systems, and it contracted with Henshaw Electric to design this software. As part of the original systems at both plants, Behr installed the Estabell, color changers, solenoid valves, fluid transducers, speed transducers, shaping air transducers, optic-to-electric box, fiber optic cables, and consoles.

EPC was formed in 1992 by former Ford LAP engineers George Campbell and Kevin Herbert. In 1989, Herbert supervised the installation of Behr's new automated paint finishing system at Ford, working extensively with Henshaw Electric on the controls portion of the job, while Campbell, Ford LAP's Paint Shop Manager, was responsible for overseeing

the system. In 1993, Ford hired EPC—independently of Behr—to rewrite the software for the automated paint finishing system. Although EPC maintains that it does not manufacture hardware,[6] EPC developed its own "closed loop fluid control system," a type of paint flow meter and regulator that measures the amount of paint flowing to the Estabell by a gear which turns as paint is pumped through the system. Unlike Behr's technology, EPC's closed loop fluid control system can be adapted to any equipment on the market and retrofitted to existing systems.

*Behr and EPC's Business Relationship*

From 1992 until the time the parties entered into the agreements that are the subject of this litigation, EPC worked with Behr as a subcontractor, performing software upgrades and modifications for Behr paint systems on about a dozen projects valued at over $5.4 million. Werner Baumgartner, the President of Behr, testified that Behr subcontracted out work to EPC when Behr was too busy to perform the work in-house. Baumgartner also testified that as Behr began giving EPC more work, he became increasingly concerned about the proprietary information given to EPC and the knowledge EPC would gain by working on projects relating to Behr equipment. As a result, Baumgartner requested that EPC enter into a non-disclosure agreement. In January 1994, Baumgartner originally drafted a global non-

---

4. EPC also designs, develops and installs air supply systems, ovens, phosphate/PO systems and abatement equipment.

5. George Campbell, EPC's President, distinguished Behr and EPC's businesses as follows: "Behr has patents that protect [sic] anybody [from] copying the rotary atomizer, the mechanical parts of the equipment, so the mechanical hardware, Behr physically makes it and develops it itself. The controls and the controls hardware, which is the computer,

that's what we work in … Behr really specialized in [ ] actually replacing manual spray zones with automated zones with a prepackaged piece of software.… [W]e were in the business of upgrading since we don't have mechanical hardware to offer."

6. It is unclear from the record whether EPC's closed loop fluid control system is primarily "software" or "hardware" (equipment).

disclosure agreement under which EPC would "assign, transfer, and convey to Behr" all of EPC's rights to [anything conceived, authored, improved, created or developed by EPC ... which relates to any matter, thing, process or method of manufacture connected or associated in any manner whatsoever with EPC's work or with tests carried on by Behr Systems, Inc., or which is within the scope of Behr Systems, Inc. business or potential business....] EPC rejected this proposed agreement as being much too broad, especially in light of EPC's interest in protecting its closed loop fluid control system.

Accordingly, Behr prepared and submitted to EPC an entirely new document, "Non–Disclosure and Site Agreement—CAMI," which EPC executed on March 28, 1994. This agreement provided that EPC would "neither compete or [sic] solicit orders individually without Behr Systems, Inc.'s knowledge and approval at the Cami [Intersoll, Ontario assembly plant] site." The agreement also provided:

EPC, Inc. will actively solicit further business at Cami and, if successful, complete all future business through Behr Systems, Inc., as mutually agreed. EPC, Inc., is interested in developing its relationship with Behr Systems, Inc., and recognizes the proprietary nature of the information it would be exposed to. On a site-by-site basis, EPC, Inc. would propose to enter into a non-disclosure/compete agreement with Behr Systems, Inc. At a point in time when the volume of business dictates, then EPC, Inc. would be prepared to consider any total agreement covering all sites in the U.S.

At trial, Campbell, the president of EPC, explained that EPC agreed not to compete with Behr at CAMI because EPC

had no prior relationship with CAMI and EPC stood a better chance of obtaining work at that site if it did so in conjunction with Behr. Campbell also testified that the phrase "as mutually agreed" was included because in competitive bid situations, EPC needed to be able to negotiate with Behr what sort of margin Behr would get on EPC's work because too high of a margin would potentially cause the Behr and EPC team to lose bids. In November of 1994, the parties entered into an essentially identical agreement governing their relationship at Chrysler's plant in Sterling Heights, Michigan.

*The Upgrade at Ford LAP: Phase One*

By 1995, the computers and software that controlled the original automated paint systems Behr installed at Ford LAP had become outdated. Ford LAP thus decided to upgrade its "GEM80" computer system to an "Allen Bradley" computer system.[7] On February 10, 1995, Ford LAP held what the parties refer to as a "kickoff meeting" at which both Behr and EPC were present. At this meeting, Ford LAP detailed the zones in which 18 programmable logic computers would be replaced. Behr was chosen to complete the full project, and Ford LAP did not specify which work EPC was to perform, if any. After the meeting, Behr asked EPC to submit a cost outline for the GEM80 replacement in all of the identified zones, and on March 22, 1995, EPC submitted a cost proposal to Behr for the entire GEM80 replacement project. In that proposal, EPC divided the project into two categories of work—upgrades to "Behr equipment" and upgrades to "Other GEM80 Systems." EPC listed the following under the heading of "Behr Equipment":

1.1   Tutone Feather Duster

---

**7.** "GEM80" and "Allen Bradley" are both types of programmable logic computers.

1.2   Enamel # 1 Feather Duster
1.3   Enamel # 2 Feather Duster
1.4   Enamel # 1 Clearcoat
1.5   Enamel # 2 Clearcoat
1.6   Basecoat Reciprocator # 1
1.7   Basecoat Reciprocator # 2
1.8   Enamel # 1 Basecoat
1.9   Enamel # 2 Basecoat
1.10   Prime [Zone]

The tasks described beneath these sub-headings seem to involve connecting the computer controls to the equipment that the controls operate. For example, under "Enamel # 1 Clearcoat," the proposal lists various tasks, including "Installation of a new 6 door electrical panel . . . ," and "Re-wire motor feeds and PEC's." The proposal also includes the "[a]ddition of closed loop fluid control . . ."

EPC listed the following under "Other GEM80 Systems":

Prime Oven Incinerator

E–Coat Oven Incinerator

Clearcoat Abatement Incinerator

Carbon Absorption Unit

PVC Robots—North Conveyor Controller

PVC Robots—North Cell Controller

PVC Robots—South Conveyor Controller

PVC Robots—South Cell Controller

At trial, Campbell testified that the items listed under "Other GEM80 Systems" were not "Behr work" and did not relate to "Behr equipment."[8] Campbell acknowledged that EPC was free to bid directly to Ford on the upgrades to these items and in fact did so with respect to the clearcoat abatement incinerator, carbon absorption unit, ovens, and robots. Simi-

larly, Herbert, Executive Vice President and co-owner of EPC. testified that EPC was free to perform—and in fact did perform—upgrades directly for Ford on "the robot zones, the incinerators, [and] the carbon wheel, to name a few," all of which he classified as "not related to Behr equipment." According to EPC's categorization, less than half of the GEM80 replacements were to occur in areas related to "Behr equipment."

Ford LAP decided to pursue the project in phases rather than upgrade the entire plant at one time. The first phase involved upgrading the reciprocators and changing the GEM80 computer system to an Allen Bradley computer system in the prime zone. EPC did not bid directly to Ford on that phase of the project; rather, Behr submitted a proposal to Ford that incorporated the cost proposal that EPC had submitted to Behr. On January 19, 1996, Behr and EPC revised the proposal to include EPC's closed loop fluid control system and its operator interface software, and on March 12, 1996, Behr was given the purchase order. Behr ended up performing the reciprocator upgrades directly itself, while EPC performed the work related to the prime zone. Specifically, EPC converted the GEM80 computer-panel control system to the Allen Bradley system, modified the program that operated the computer, and replaced the prime system console. EPC also added its closed loop fluid control system, modified the fluid transducer, and reconnected the new computer to the existing transducers and valves.

*Negotiating History of Site Agreements*

In November 1995, Behr prepared for EPC's consideration a global confidentiali-

---

8. On April 25, 1995, EPC provided Behr with a clarification for the work to be performed in the reciprocators, basecoat, clearcoat and prime zones, which were all listed under the heading "Behr Equipment." In this document, the "feather dusters" were removed from the "Behr equipment" designation.

ty agreement, which would require EPC to keep confidential the "programming software, source codes, electrical and mechanical design information and engineering information" EPC needed from Behr in order to perform software development services for Behr. This agreement also sought to prohibit EPC from "seek[ing] additional business opportunities" with the "end user" of the software development services "unless specifically approved by Behr Systems." Campbell refused to sign this agreement because it was too restrictive, especially in the wake of the Ford LAP kickoff meeting announcing the extensive upgrades Ford LAP planned undertake.

On May 28, 1996, the parties executed a "Non–Disclosure and Site Agreement" for the Ford LAP, one of the two Agreements at issue in this case, which was incorporated into the terms of the purchase order. The final version of the agreement provided:

> In recognition of the close working relationship between Behr Systems, Inc. and EPC, Inc. required in the development of the closed loop fluid control system for Ford LAP, EPC, Inc. will not pursue Behr work without Behr Systems, Inc.'s knowledge and approval at the Ford LAP site.
>
> EPC, Inc. will actively solicit further business at LAP and, if successful, complete future business through Behr Systems, Inc., as mutually agreed where appropriate. However, it is recognized that EPC, Inc. is independent company and, as such, is able to solicit and obtain contracts direct with the plant not related to Behr equipment. Behr Systems, Inc. acknowledges EPC as their preferred subcontractor for LAP.

This agreement will expire on December 31, 1998.

Although Behr drafted most of this agreement, Campbell requested that the words "Behr work" and "related to Behr equipment" be added to the Agreement.[9] Campbell also asked that the agreement contain an expiration date. At trial, Campbell explained that EPC did not want to use the same agreement that the parties had previously used on the CAMI or Sterling Heights projects because EPC was concerned that those agreements would overly restrict EPC's ability to work at Ford LAP in the future.

### The Upgrade at Ford LAP: Phase II

The second phase of the Ford LAP project, which involved the upgrade of the computer panels in the two clearcoat zones, began in 1997. EPC submitted a cost proposal to Behr, in which it characterized the work to be performed as work relating to "Behr equipment." Behr was awarded the contract. Behr and EPC executed an agreement identical to the previous one, except that the expiration deadline was extended to December 31, 1999. EPC replaced the consoles originally installed by Behr, and performed the same work that EPC had done in the prime coat zone.

### The Nissan Project

Nissan also sought to upgrade the paint automation system Behr had installed in its plant. The first upgrade took place in 1996 in one of the clearcoat zones. Specifically, Nissan wanted to replace its Siemens processor with the GE99070 and install a closed loop system for bell speed and fluid control in that zone. Behr issued

---

**9.** Baumgartner testified "I think what happened is that Mr. Campbell marked up an original CAMI agreement with some language. I probably reviewed it, and we came up with an agreed verbiage, yes."

a purchase order to EPC, and the parties entered into a site agreement relating to the Nissan Plant essentially identical to the Ford LAP Agreement. In 1997, a second, identical upgrade at the Nissan Plant occurred in the second clearcoat zone. Nissan awarded the project to Behr, Behr hired EPC as a subcontractor, and Behr issued a purchase order to EPC to replace the computer, install the closed loop fluid control and perform a speed control upgrade on the clearcoat zone— work which Baumgartner considered "related to Behr equipment." On April 23, 1997, Behr and EPC entered into a site agreement identical to the previous Nissan and Ford LAP agreements, with an expiration date of December 31, 1999.

*The Dispute*

In October 1997, General Motors requested quotes from EPC, Behr, and AEG (a competitor of Behr) for the upgrade of Behr equipment at its Flint, Michigan plant. The parties agree that this project was not covered by any of the agreements between Behr and EPC. Campbell testified that Behr and EPC discussed the possibility of providing GM with a joint quote but that Einer Endregaard, a Behr employee, told him that Behr was not going to use EPC on the project and that EPC was free to bid on the job independently. Baumgartner testified that Behr and EPC initially discussed bidding together on this project but ultimately decided not to. Baumgartner also explained that in September 1997, Behr had to lay off some employees and that Behr's decision to do the work in house (rather than subcontract it out to EPC) was due to the fact that Behr "desperately" needed work. EPC's quote was $400,000 below Behr's bid. Behr was ultimately awarded the job, but only after agreeing to do it at the price quoted by EPC. At trial, Baumgartner testified that he felt "stabbed in the back"

by EPC's decision to bid on the project after Behr had "made a lot of effort to sub our work out to EPC."

On December 17, 1998, Baumgartner, Campbell, and Herbert met in Baumgartner's office in Michigan to resolve their differences. The meeting lasted approximately ten minutes. According to Behr, EPC stated that it would not compete any more with Behr on projects because it did not want to jeopardize its business relationship with Durr Industries, Inc., a sister company of Behr. According to EPC, EPC, "anxious to calm the situation" offered to enter into a new non-disclosure and non-compete agreement with Behr, if Behr would commit to a volume of business sufficient to support such an agreement. Campbell testified that Behr rejected this offer and that Baumgartner told him "unequivocally that EPC was no longer in Behr's future plans and that Behr would not use EPC as a subcontractor, preferred or otherwise at any site for any job in the future, including any future work at Ford LAP or Nissan." Herbert testified that he understood Behr's response to mean that Behr would never use EPC as a subcontractor again on any project in any capacity. Campbell testified that at other meetings over these few days, Terry Daniels, Behr's engineering director, told him that Behr would use EPC only on a "time and materials" basis, which Campbell considered a dramatically less lucrative arrangement for EPC. Campbell testified that EPC viewed Behr's statements as a unilateral repudiation of Behr's obligation under the site agreements to use EPC as its preferred subcontractor and that EPC therefore considered itself to be released from any obligations it owed Behr under the site agreements. Baumgartner denies making any such statements.

A few days later, on December 23, 1997, Herbert sent Daniels a letter proposing to offer Behr exclusive use of EPC's closed loop fluid control system on future projects. This letter began, "From our review of meetings on 12/17 and 12/18 at Behr, we understand that Behr on future jobs will 'in-source' work and is only offering a T & M [Time and Materials] based contract to EPC on this and future work for Behr based systems." Over the next ten months, Behr issued four purchase orders to EPC for approximately $160,304 in work related to the Flint project, which Behr argues is evidence that it did not terminate the relationship. EPC contends that the fact that Behr paid EPC after the December 17th meeting does not mean that the relationship had not been terminated, because Behr and EPC had finalized their negotiations for work on the GM Flint project in letters dated November 11, 1997, and December 9, 1997. EPC cites the fact that EPC was paid only $160,304 on a time-and-materials basis for the GM Flint job, rather than the estimated $750.000 EPC could have earned had Behr used EPC as its "turnkey" subcontractor, as evidence that Behr had in fact decided to terminate its "preferred subcontractor" relationship with EPC. The GM Flint project was the last time the parties worked together. Baumgartner testified that in the nine months between the dispute over the GM Flint project and when EPC bid directly on the Nissan project, Behr did all of its work in house because its people needed the work. Baumgartner also testified that none of the jobs it performed during this period in 1998 "would have fitted EPC's capabilities anyway." EPC

does not provide any evidence that Behr used another subcontractor rather than EPC during this period or on subsequent projects.[10]

### EPC's Alleged Breach of the Ford LAP Agreement

In 1998, Ford continued with the upgrade of the GEM80 computer systems in the two basecoat zones, the same work that was previously awarded to Behr in the two clearcoat and primecoat zones. Ford's request for bids asked that the upgrade to the basecoat automation be "consistent with systems that EPC has previously installed." Baumgartner testified that at the time Behr submitted its bid to Ford, Behr was not sure whether it would need EPC's assistance in the basecoat zone upgrade. At trial, Baumgartner explained that although Ford LAP's Request for Quotation stated that the project was to be completed in July, Behr believed that the project would not be completed until December, at which time Behr's capacity might have changed. Accordingly, in preparing its cost proposal for Ford, Behr did not ask EPC for a price estimate but rather used the same estimate that EPC had given Behr for its upgrade of the basecoat zone in 1995, three years earlier. When the court asked Baumgartner whether this figure would be out of date, Baumgartner explained that there were few materials involved and that Behr had added a few percentages for inflation. Baumgartner admitted that Behr never told Ford or EPC that it was considering using EPC as a subcontractor on this project.

EPC, meanwhile, assumed that Behr had submitted its bid without considering

---

**10.** EPC argues on appeal that Behr breached the site agreements by not including EPC in its proposals even though Behr necessarily needed to subcontract out some of the electrical installation work. However, this issue appears to be a red herring. Baumgartner testified that in the United States, both Behr and EPC cannot install electrical equipment on their job sites themselves, but rather are required to use a union contractor. Campbell agreed.

EPC.[11] On May 13, 1998, EPC submitted directly to Ford its own bid on the work to be performed in the basecoat zones directly to Ford and followed up with a phone call to Ford. EPC did not inform Behr that it was bidding directly on the Ford project and did not ask Behr's permission to bid on the project. Ford awarded the project to EPC. EPC supplied the closed loop system at Ford LAP and upgraded the GEM80 computers to Allen Bradley computers. According to Behr, this work was exactly the same kind of work that EPC had previously performed under contract with Behr in the primecoat and clearcoat zones, a claim which EPC does not dispute.

After learning from Ford that EPC had won the bid, Baumgartner called Campbell to find out what had happened. Baumgartner told Campbell that he had just learned that EPC was doing "Behr work" and reminded Campbell of the agreements. Campbell explained that EPC had bid directly on the contract because Behr had already breached the agreement, thereby relieving EPC of any obligations under the agreement. Campbell did not defend EPC's actions on the ground that the parties did not have an enforceable agreement or that the work to be performed by EPC did not constitute "Behr work" or relate to "Behr equipment." Behr argues that as a result of EPC's breach, Behr suffered damages of $608,000, which represents the profit it would have received on this project.

### EPC's Alleged Breach of Nissan Plant Agreement

In October 1998, Nissan asked Behr and EPC to bid on the upgrade of the side bell indexing. EPC submitted a bid on October 5, 1998, and Behr submitted a bid to Nissan on October 6, 1998. According to Campbell, EPC waited to see whether Behr would include EPC in its proposal before EPC submitted its own bid. After these bids were submitted, the scope of the project was expanded. Behr, however, did not know that the scope of the project had changed. On November 12, 1998, EPC submitted a third revised quote to Nissan for a complete turnkey paint bell applicator control system. EPC did not consult or seek approval from Behr to bid directly to Nissan, and EPC was eventually awarded the purchase order. Behr never submitted a revised bid. The upgrade work EPC performed at Nissan included modifying the basecoat bell zone and the prime zone, changing the fluid control and bell speed, and upgrading the shaping air control in the clearcoat zones. According to Baumgartner, this upgrade work was virtually identical to the work EPC performed at Nissan under the contracts with Behr from April 1996 to January 14, 1997, and EPC's decision to bid on the job independently was exactly the kind of action that the site agreements were intended to prevent. Behr claims that as a result of EPC's breach of the Nissan plant agreements, Behr suffered damages in the amount of $200,000. EPC argues that because Behr never ended up submitting a revised bid on the Nissan project, it suffered no damages at all.

### Procedural History

On October 21, 1998, Behr filed a two-count complaint against EPC alleging

11. Campbell stated in his affidavit that "in the course of completing the job at GM Flint, EPC approached Behr with a proposal to work with Behr at an upcoming job at Ford LAP.... Behr rejected that proposal and a bid that job at Ford LAP without EPC." However, at trial, Campbell testified that he did not contact Behr regarding the Ford LAP project and that Behr did not contact him or EPC.

breaches of the Non–Disclosure and Site Agreements for the Ford LAP and Nissan projects. On November 4, 1999, Behr filed a first amended complaint against EPC, raising additional claims of breach of implied contract and promissory estoppel. EPC filed a motion for summary judgment on February 18, 2000, arguing that the agreements were not legally enforceable because the parties did not have a meeting of the minds regarding the contract terms, the agreements were not supported by adequate consideration, and the agreements lacked mutuality of obligation. EPC also moved to dismiss Behr's claims for breach of implied contract and promissory estoppel.

On April 19, 2000, the district court denied EPC's motion for summary judgment on the breach of contract claims, holding that the phrases "Behr work" and related to "Behr equipment" were ambiguous and therefore created issues of fact regarding the parties' intent. The court, however, granted EPC's motion with respect to Behr's claims for breach of implied contract and promissory estoppel, finding that the implied contract claims were barred by the statute of frauds, and that the promissory estoppel claim was precluded by the existence of an express contract between the parties. Behr does not appeal the grant of summary judgment of these claims.

At trial, representatives of Behr and EPC offered diverging accounts of what they understood the site agreements to mean. Baumgartner testified that "Behr equipment" included both hardware and software and that "Behr work" referred to work on both "hardware controls and software to operate the Behr equipment." Baumgartner interpreted the Ford LAP site agreement to mean that:

> EPC would not compete at LAP on Behr-related work, Behr equipment. They would not, quote, work directly for Ford Motor Company on anything what [sic] Behr installed previously in the plant, hardware, software, controls, everything. And also if they would be approached by Ford, they would notify Behr Systems to either ask for permission to quote or would quote through Behr Systems.

When asked whether there were any areas at Ford LAP which would not count as "Behr work" and on which EPC would be free to bid directly to Ford, Baumgartner responded, "Sure. There are spray booths, ovens, phospate and E-coat systems, air supply houses, paint circ[ulation] systems." At trial, Baumgartner insisted that Campbell, whom he considered "very familiar with paint application equipment," shared his understanding that "Behr work" meant "everything associated with Behr equipment and making the Behr equipment work," but admitted that he and Campbell never specifically discussed which pieces of equipment were included. Baumgartner interpreted the site agreements to mean that in return, Behr "would recognize EPC as our preferred subcontractor, meaning we would—EPC would get the first choice if we would need a subcontractor."

In contrast, when asked how EPC interpreted the site agreements, Campbell testified:

> We weren't going to work with their competitors like Meyer, Ransburg. See, the bell, the rotary atomizer that you saw that picture of, we could have— right now they want to upgrade those at Ford say, and we could have gone there and given them Ransburg ones, put them in place and made the improvement for Ford, but we didn't want to work with their competitors, Behr's. That was the arrangement. Otherwise ... [w]e could have worked with their competitors and sold robots instead of

rotary atomizers.... They were interested, and so were we, in working together.

Campbell interpreted the provision in the Site Agreement that "EPC will actively solicit further business at [Site] and, if successful, complete future business through Behr Systems, Inc., as mutually agreed where appropriate" to mean:

> [I]f we agreed we are going to work together, then we will work together. If we can't find agreement to work together, then we won't work together.

> \*   \*   \*   \*   \*   \*

> I believe both parties could change their mind about pursuing this type of agreement in the future because, you know, I didn't see that this really rose to the level of a contract. It's an agreement. It's called an agreement. That's the words.

Campbell testified that the "as appropriate" language was added because Behr "wouldn't agree to a certain volume of work with us or guarantee that they would ever use us." Campbell insisted that given EPC's strong and long-standing relationship with Ford, he would never have entered into the site agreements if he had believed that EPC could work at Ford only if it asked Behr's permission. Campbell also testified that he interpreted "preferred subcontractor" to mean that Behr would use EPC for "a certain volume of business."

The court actively questioned the witnesses during the three-day bench trial and eventually ruled that the agreements were too ambiguous to be enforced. The district court determined that the agreements were "ambiguous on their face" and that it was not possible to determine the meaning of "Behr work" based on the parties' conduct. The court explained:

Each of the parties certainly had different interpretations of the agreement, which I thought were reasonable from their own perspective [sic]. Neither of the interpretations that the parties had were I thought inherently more reasonable than the other, but the key thing was trying to figure out what Behr work—what the term "Behr work" meant....

[B]oth parties were represented by what seemed to me to be two very sophisticated people who were certainly capable of reaching a more definite agreement if they had chosen to do so. It seems to me for their own reasons they didn't. It also doesn't seem to me reasonable that either one of them would have readily agreed to the other's interpretation of the agreement.

Also, it seems to me that each side seems to have acted pretty consistently with its own interpretation of the agreement. I think there probably is a core agreement among the parties, but I don't think it's very possible to resolve this case from whatever core there is. It does seem to me that both sides again seem to have abandoned the agreement to the extent they had agreement to some extent once the relationship became really not in [sic] at various different times either one of their own best interests. I could try to pick between the two interpretations, but I don't think that doing that would make it a very fair enforcement of a mutual intent on either side....

I think that the term—Behr's interpretation of the term "Behr work" under the circumstances is just much too broad and really isn't supported by in my view the economic reality of the upgrade work that was being done, nor is it supported by the limited and conflicting language of the agreement.

The district court did not specify the factual findings underlying its determination, but stated:

> I think in deciding this case I don't have to really disbelieve one side or believe the other. For instance, the December [17th] meeting, because I'm finding there really wasn't—the contract was too indefinite to enforce, I didn't put that much focus on what did or didn't happen in that particular meeting.

After the entry of judgment in EPC's favor, Behr moved for reconsideration, amendment of judgment, or new trial, which the court denied. This appeal followed

### DISCUSSION

#### Standard of Review

Under Kentucky law, the interpretation of a contract, including the determination of whether it is ambiguous, is a question of law reviewed *de novo*. *See First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835–36 (Ky.Ct.App.2000). However, "[w]hen the effect of a written contract depends largely on extrinsic evidence, the construction of the contract is essentially a finding of fact, not law." *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F.Supp. 948, 950 (E.D.Ky.1994), *aff'd* 73 F.3d 362 (6th Cir.1995) (citing *Cook United, Inc. v. Waits*, 512 S.W.2d 493 (Ky. 1974); *Neel v. Wagner–Shuck Realty Co.*, 576 S.W.2d 246 (Ky.App.1978)); *see also Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir.2001) (holding that in interpreting contracts, "[t]he existence of ambiguity is a de novo question for this court, but a trial court's resolution of ambiguity based on extrinsic evidence may not be overturned unless clearly erroneous"); *Herman v. Jackson*, 405 S.W.2d 9, 11 (Ky.1966) (holding that lower court's determination that there was "no meeting of the minds," and therefore no enforceable contract, was not "clearly erroneous").

#### Principles of Kentucky Contract Law

"In construing contracts, courts look to the entire instrument and deduce the intention of the parties from the language employed." *Martin Oil & Gas v. Fyffe*, 251 Ky. 517, 65 S.W.2d 6867 (1933). "[W]here a contract is free from ambiguity, 'it needs no construction and will be performed or enforced in accordance with its express terms.'" *First Commonwealth Bank of Prestonsburg*, 55 S.W.3d 829, 836 (Ky.Ct.App.2000) (quoting *Ex parte Walker's Ex'r*, 253 Ky. 111, 68 S.W.2d 745, 747 (1933)). However, when a contract is reasonably subject to more than one interpretation, Kentucky courts apply the doctrine of "contemporaneous construction," which provides that "[t]he construction of the parties is best evidenced by their conduct with respect to the agreement." *See A.L. Pickens Co., v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir.1981) (citing *Billips v. Hughes*, 259 S.W.2d 6, 7 (Ky. 1953)). Courts may also look to surrounding circumstances as a guide. *See Cinelli v. Ward*, 997 S.W.2d 474, 478 (Ky.Ct.App. 1998). On appeal, Behr and EPC agree that the site agreements are ambiguous on their face and that it is therefore necessary to look to extrinsic evidence—such as the parties' behavior, the economic context, and the negotiating history of the agreements—to determine the parties' intent.

As both parties acknowledge, a contract is not enforceable if there is no "meeting of the minds" as to its core terms. However, a party cannot rely on an objectively unreasonable interpretation of an agreement to support its claim that there was no meeting of the minds. *C.f. City of Detroit v. Simon*, 247 F.3d 619, 629 (6th Cir.2001) (holding, in context of oral settle-

ment agreement, that one party's unreasonable subjective interpretation of the agreement did not preclude a finding that there had been a meeting of the minds). Moreover, "[t]here is another cardinal rule in the construction of contracts which are susceptible of two meanings, viz. that the construction should be given, if the facts justify it, which would render the contract enforceable, rather than to adopt a construction which would render it unenforceable." *United States v. Board,* 14 F.2d 459, 460 (W.D.Ky.1926) (applying this rule to reject interpretation of Kentucky contract that would render it void as against public policy).

### Are the site agreements too ambiguous to be enforced?

The district court based its conclusion that the contracts were too ambiguous to be enforced on three findings. First, the court noted, Behr and EPC had divergent interpretations of the agreements, both of which were "reasonable from their own perspective" and neither of which was "inherently more reasonable than the other." There was no "core agreement" with respect to the issues in dispute, as evidenced by the facts that the agreements were "ambiguous on their face," the terms "Behr work" and "Behr equipment" were undefined, and neither of the parties would have "readily agreed to the other's interpretation of the agreement." Second, the district court came to the conclusion that Behr's interpretation of "Behr work" was "much too broad" and "really [wa]sn't supported by ... the economic reality of the upgrade work that was being done" or "the limited and conflicting language of the agreement." Finally, the court found, each party "acted pretty consistently with its own interpretation of the agreement." We review the evidence to support these conclusions in turn.

### Is EPC's interpretation reasonable?

We conclude that the district court erred in holding that both Behr and EPC's interpretations of the site agreements were "reasonable from their own perspective" and that neither interpretation was "inherently more reasonable" than the other. The problem is with EPC's interpretation. Campbell testified that EPC understood the site agreements to mean only that EPC was precluded from working with one of Behr's *competitors.* Under this definition, EPC would not be guilty of committing a breach. However, EPC does not explain how this interpretation is derived from the language of the agreements. In fact, when EPC's counsel explained at trial that EPC understood the site agreements to mean that EPC would not "go bid with one of its competitors to do an upgrade at one of these plants," the court responded:

> But it doesn't say that. I'm not sure what it does mean, but if what they wanted—if what the parties wanted was to stop—was to prevent EPC from working with somebody else, then they could have easily said that.

EPC's interpretation is, however, consistent with its reading of "Behr work" and "Behr equipment." Campbell did not testify as to how EPC interpreted "Behr work" or "Behr equipment" specifically, but EPC's counsel seemed to suggest that EPC interpreted these terms to refer only to the actual painting equipment, not software or controls equipment. EPC's counsel explained that, under EPC's interpretation of the site agreements, the only way EPC could breach the agreements would be to work with one of Behr's direct competitors because EPC was "not capable" of upgrading hardware by itself.

We conclude that this interpretation is unreasonable in light of the language of the site agreements. As the district court

pointed out, if the site agreements were intended to prevent EPC from working with Behr's competitors, why did they not simply say so? Instead, the agreements make no mention of "competitors." There is a provision "recogniz[ing] that EPC, Inc. is an independent company and, as such, is able to solicit and obtain contracts direct [sic] with the plant not related to Behr equipment" that seems to draw a distinction between projects that EPC must bid through Behr and projects on which EPC can obtain contracts independently, not between projects on which EPC must work as a subcontractor for Behr and those on which EPC can work as a subcontractor for one of Behr's competitors. Once the "competitor" reading is rejected, EPC's narrow interpretation of "Behr equipment" falls apart, for EPC provides no explanation why Behr would bother to require EPC to enter a contract that merely prohibits EPC from providing a service that EPC is not technically capable of providing. Nonetheless, EPC could still prevail if it could show that its interpretation of the term "related to Behr equipment" is at least as reasonable as Behr's. This issue is best addressed by discussing Behr's interpretation of the terms.

*Is Behr's interpretation too broad?*

Behr argues that although "Behr work" and "Behr equipment" are not defined in the site agreements, extrinsic evidence provides a meaning for these terms that is sufficiently definite to render the site agreements enforceable and under which EPC would be liable for breach. The district court, however, held that Behr's interpretation of the contract was "much too broad" and "unsupported by the economic reality of the subcontracting work" or the "limited and conflicting language of the agreement." It is unclear how these statements are to be reconciled with the district court's finding that both parties' interpre-

tations were "reasonable" and that neither party's interpretations was "inherently more reasonable" than the other. In any event, we believe that the evidence suggests that Behr's reading of the site agreements is more reasonable than EPC's.

At trial, Baumgartner defined "Behr work" as work related to "Behr equipment," which he defined as including both hardware and the software necessary to operate the hardware. Baumgartner also defined "Behr equipment" as including "anything [t]hat Behr installed previously in the plant, hardware, software, controls, everything." According to Baumgartner, "non-Behr" equipment would include "spray booths, ovens, phosphate and E-coat systems, air supply houses [and] paint circ[ulation] systems."

Behr argues that EPC itself recognized the distinction between "Behr equipment" and "non-Behr equipment" in its March 1995 cost proposal to Behr outlining the work it would perform in replacing the GEM80 computer system at Ford LAP. In this document, EPC listed under the heading of "Behr equipment" a variety of work involving the clearcoat, primecoat, and basecoat zones. The tasks described under "Behr equipment" seem to involve installing the connections between the computer controls and the equipment that the controls operate. Behr explains that the upgrade of the computers at both the Ford LAP and Nissan plants related to Behr equipment because the upgrade "changed how Behr's paint application system and its various components communicated with the computer system." Behr also argues that EPC's installation of its closed loop fluid control system related to Behr equipment because the closed loop fluid control was installed between the color changer and the paint flow regulator, which are part of the original paint application system installed by Behr. EPC contends that

this understanding is too expansive and that the controls and software work it performed, as well as the installation of its proprietary closed loop fluid control system, should not be considered "Behr work" or "related to Behr equipment."

We find this argument persuasive. Although Baumgartner's definition of "Behr equipment," standing alone, might be too expansive, the site agreements prohibit EPC from bidding independently on work "related to Behr equipment." Given the proposal's description of the tasks to be performed in each of the areas listed under "Behr equipment," it seems reasonable to interpret "related to Behr equipment" to include the work EPC did to the software designed to operate the equipment, as well as any physical installation work that EPC had to do to connect the controls to the equipment. Although the site agreements did not refer to EPC's proposal, the proposal demonstrates that EPC shared an understanding of "Behr equipment" that overlapped in important respects with Behr's understanding. In the absence of a compelling alternative interpretation of these terms by EPC, we find that these designations are significant.

EPC contends that the site agreements are internally inconsistent—and therefore too ambiguous and indefinite to be enforced—because "[w]hile the language in the first paragraph limits EPC's ability to 'pursue' some undefined type of work, the language of the second paragraph expressly allows and in fact obligates EPC to solicit future work at the site." But regardless of how the terms "Behr work" and "Behr equipment" are interpreted, the two provisions can be read consistently to mean that EPC can (and should) solicit further business opportunities from the client at a particular site, but that it cannot *accept* any work relating to "Behr work" without Behr's knowledge and approval.

In other words, with respect to "Behr work," any further business successfully solicited by EPC must be completed through Behr "as mutually agreed where appropriate." In contrast are the projects "not related to Behr equipment," on which EPC is free "to solicit and *obtain* contracts direct[ly]" without Behr's approval or involvement. Significantly, this reading is consistent with Baumgartner's testimony at trial that EPC was free to *solicit* any work it wanted.

EPC also argues that the phrase "as mutually agreed where appropriate" renders the parties' obligations under the site agreements voluntary. The site agreements provide:

> EPC, Inc. will actively solicit further business at [site] and, if successful, compete future business through Behr Systems, Inc., as mutually agreed where appropriate.

Campbell testified that he interpreted this language to mean that the parties would work together if they agreed to do so, but that if they did not reach an agreement, they would not be obligated to work together—in other words, "both parties could change their mind about pursuing this type of agreement in the future." We see two problems with this interpretation. First, Campbell testified that the phrase "as mutually agreed" was included in the CAMI site agreement so that the parties could negotiate the margin that Behr would take on the work EPC performed as Behr's subcontractor. Because Campbell interpreted the CAMI agreement to *require* EPC to complete "any such work with Behr," the term "as mutually agreed," standing alone, cannot be interpreted to give EPC the freedom not to agree to work with Behr in the future. In our view, the addition of "where appropriate" in the site agreements does not alter this result, for its placement (and the absence

of an "and" between "agreed" and "appropriate") suggest that "where appropriate" modifies "as mutually agreed" rather than "will ... complete future work through Behr Systems, Inc." Second, if the site agreements were interpreted to bind EPC to work with Behr only if the parties reached an agreement at a future date, there would be no consideration for Behr's (unequivocal) obligation to use EPC as a preferred subcontractor.

The district court did not explain how the economic reality of the upgrade work undercut Behr's interpretation of the agreement. EPC argues that given its long-standing relationship with Ford, it would never have entered into an agreement that would obligate it to "sit idly by and do absolutely nothing" until Behr decided whether to bid. However, EPC does not argue that it enjoyed a similarly strong relationship with Nissan, and yet the Nissan site agreements are identical in all material terms to the Ford LAP agreements. EPC was free to bid, and did in fact bid, on other projects at the Ford LAP site. Finally, in consideration for entering into the agreement, EPC received the right to be Behr's preferred subcontractor. The parties do not offer evidence concerning how much this right was worth. Absent such evidence, We cannot conclude that Behr's interpretation of the contract was unreasonable.

### Did both parties act consistently with their interpretations of the contract?

Finally, the district court found that both parties acted consistently with their own interpretations of the contract. Based on our review of the record, however, we conclude that this determination is incorrect. Instead, the evidence suggests that both parties acted consistently with Behr's interpretation of the contract. EPC performed in conformity with Behr's

interpretation of the site agreements through 1997, the point at which it argues that Behr repudiated the agreements. EPC did not bid directly on the first two upgrades at the Ford LAP plant or the first Nissan project; rather, it waited for Behr to bid and then submitted its proposal to Behr. Yet, at the same time, EPC *did* bid directly to Ford LAP on other work, which it did not put in the "Behr equipment" category. At trial, Campbell conceded that the work on which EPC bid independently did not constitute work related to Behr equipment. If EPC were free to bid directly to Ford all along, and would never have agreed to a contract under which it would be required to "sit and wait" for Behr's initiative, it is unclear why EPC was content to wait for Behr to bid on these projects during 1996 and 1997. Second, Campbell testified that when Baumgartner called him to ask why EPC had bid directly to Ford LAP on the third phase of the upgrade, Campbell told him that EPC was not longer bound to the site agreement because Behr had breached the contract. Campbell did *not* defend EPC's actions on the ground that the parties did not have an enforceable agreement or that the site agreements did not prohibit this bid.

### If the contracts are enforceable, did EPC commit the first material breach?

Although the district court held that both parties abandoned the agreement when it no longer served their interests, the parties agree that if there was an enforceable contract, the issue of who committed the *first* material breach is crucial to the resolution of the case. EPC contends that Behr breached the contract first by informing EPC that it no longer intended to use EPC as a subcontractor and thereafter refusing to give EPC work except on a time-and-materials basis. Baum-

gartner unequivocally denies making any such statement and argues that Behr did not breach its obligation to use EPC as its preferred subcontractor simply by doing work in-house or by paying EPC on a time-and-materials basis. The district court did not make any findings as to what happened at the December 17th meeting, or as to which party repudiated the agreement first. Because resolution of these issues hinges in part on determinations of credibility, we conclude that the case must be remanded to the district court for further proceedings.

## CONCLUSION

For the reasons set out above, we REVERSE the judgment of the district court and REMAND this case for further proceedings consistent with this opinion.